THE BOARD OF SUPERVISORS OF SANILAC COUNTY V. THE
AUDITOR GENERAL.

*Swamp lands—Interest upon proceeds of sales—Taxes—Constitutional law—Title of act—Gift.*

1. On a review of the swamp-land legislation of this State, the Court are unable to find any ground upon which a *mandamus* can issue to compel the payment to the relator of its proportion of the tax ordered to be levied in 1886 by Act No. 222, Laws of 1885, for interest money alleged to be due on sales of swamp lands, as the share belonging to said relator.

2. The proviso in section 2 of Act No. 222, Laws of 1885, directing the levy and collection of taxes to pay the amount due the several counties for interest on the so-called " Swamp-Land Fund," is not covered by the title to the act, and is void.

3. The following propositions are summarized from the opinion of Mr. Justice CAMPBELL:

*a*—Courts have no power to pass upon the disposition of the proceeds arising from the disposal of the swamp lands granted this State by Congress, or to review the decision of the Legislature concerning the extent of the necessity for the use of such proceeds or of said lands for the purpose of reclaiming the lands by levees and drains.

*b*—Considering the counties in their *corporate* capacity as the intended beneficiaries, which is at least not clear, the swamp-land legislation up to 1885 was nothing more than an intended gift not carried out.

*c*—A gift resting merely in intention, even though accompanied by a promise, could not be enforced against an individual, and is still less binding on the public.

*d*—There can be no question of the right to recall any merely proposed gift so long as it remains in the hands of the giver.

*e*—There can be no doubt of the power of the State Legislature to refuse to perform even a contract, and, where it forbids the application of money in the State treasury to any particular use, no court can interfere.

*f*—The State is not liable to suit except as it authorizes a suit, and this authority can be revoked at pleasure.

Application for *mandamus* to compel the payment of inter-

est alleged to be due relator on the "Swamp-Land Fund," so called. Argued January 26, 1888. Denied March 2, 1888. The facts are stated in the opinion.

*Isaac Marston* and *John Atkinson,* for relator.

*Moses Taggart,* Attorney General (*C. A. Kent,* of counsel), for respondent.

CAMPBELL, J.   The application in this case is for a writ of *mandamus* to compel the Auditor General to issue his warrant on the State Treasurer for the proportion alleged to be due to the board of supervisors for the county of Sanilac out of the tax ordered to be levied in 1886 for interest money alleged to be due on the sales of swamp lands, as the share belonging to the board of that county.

The Auditor General, in response to an order to show cause, insists not only that no duty is cast upon him by law to ascertain and pay over such share, but also that the law has, as it now stands, given no money that can be so applied. Neither the application nor the returns shows just how much of the special tax levy has been collected, and one of the questions raised is in what manner and by whom it shall be determined what the share of each county is.

The legislation referred to on the argument requires attention in its consecutive dates and order.

In 1850 Congress granted certain swamp lands to the states containing them, with absolute power of disposal, imposing the duty of using as much of the proceeds or of the land as should be necessary for the purpose of reclaiming the lands by levees and drains.   9 Stat. at Large, 519.

It is not claimed that courts have any power to pass upon the disposition of these proceeds, or review the decision of the Legislature concerning the extent of that necessity.

In 1857 the previous swamp-land statutes were revised to some extent, and by section 9 of the new statute it was pro-

vided that 25 per cent. of the proceeds should constitute a drainage fund—

"For the purpose of aiding the counties in which the lands sold may lie, the interest of which, at the rate of seven per cent., shall be, 'in pursuance of law, appropriated to drain such of the said lands as are situate in the county, and which, in the opinion of the supervisors, are capable of drainage, and can be profitably drained, and shall not have been sold under the provisions of this act."

The balance of proceeds was directed to be made a part of the primary-school fund, and considered as loaned to the State, at an interest of seven per cent., which interest was to be paid into the primary-school fund annually, and the principal applied to paying the State debt. Laws of 1857, p. 236, § 9.

By this law the drainage fund and its interest became subject to future disposal. There was no present disposition made of the interest, and no other law disposed of it. The policy indicated, which was vague, seemed to contemplate future action by the State, based on information or action of the supervisors.

In 1858 a new swamp-land act was passed, and by section 5, after deducting expenses of sale, 50 per cent. was to be denominated a primary-school fund, and 5 per cent. interest thereon appropriated and distributed "in like manner as the primary-school fund of this State." The other 50 per cent. was to be denominated a swamp-land fund,—

"And the interest thereof, at 5 per centum, shall be paid over annually to the order of the board of supervisors of the several counties, in the proportion in which the same is received from the sales in said counties, respectively, to be used as said board shall direct, in draining and reclaiming swamp lands in said county."

The principal moneys were to go in payment of the State debt. Laws of 1858, p. 171, § 5. It is to be observed that this law covered past as well as future receipts.

The relators rely on this statute as creating a vested right, which they claim to have been furthered by subsequent legislation, as will be hereafter explained.

It will be observed that this law does not purport to make any gift to the counties as such, so that the interest money should become a part of the proprietary funds of the county. The use of the money was confined to the specific purpose of drainage. Under this law the primary-school moneys were sufficiently provided for and appropriated, as they were to be applied under the general laws on that subject. But there was no other legislation helping out county drainage, or giving directions concerning the collection and disposal of this drainage interest money, and none was ever collected, unless under a subsequent law of 1885, which is relied on, and which will be presently referred to.

In 1863 the Superintendent of Public Instruction applied to this Court for a *mandamus* to compel the Auditor General to account to the primary-school fund for 75 per cent. of the swamp-land moneys, and of the value of swamp lands specifically disposed of without sale. This application was based on the claim that by the law of 1857 the primary-school fund obtained a vested right in that proportion of the swamp lands and their proceeds, which could not be divested by subsequent legislation; and this claim was further rested on the ground that the State Constitution expressly exempted that fund from violation. *People v. Auditor Gen.*, 12 Mich. 171. This Court, however, held that, so far as the constitutional provision was concerned, it applied only to lands granted to the State expressly for educational purposes, and that the swamp lands were not so granted. It was held that the State might dispose as it saw fit of the proceeds of sales made thereafter. No point was raised beyond this, as the question would have been theoretical.

On June 10, 1885 (Laws of 1885, p. 245), an amendatory clause inserted in section 5 made that portion of it now under consideration read as follows:

" The interest thereof at five per centum shall be paid over annually to the order of the board of supervisors of the several counties, in the proportion in which the same is received from the sales in said counties, respectively (out of the general fund of the State)."

This was the first legislation providing any fund out of which the interest money should be paid. But thus far the statutes had not imposed any specific duty upon any public officer, so far as we are informed, whereby the proper calculations should be made and communicated to the financial officers of the State, so as to give them the necessary *data* to act upon, or to make their duty of distribution specifically ascertainable. And the record does not inform us, but denies, that there was any established official routine to supply the deficiency. This defect was sought to be supplied by the general appropriation bill of the same session, which, however, is objected to as insufficient for that purpose. Laws of 1885, p. 303. This act is entitled—

"An act making appropriations for the expenses of the State officers and State government for the years eighteen hundred and eighty-five, and eighteen hundred and eighty-six, and to provide a tax for the payment of the same."

The first section of this act provided for a tax of $892,399-.90 for 1885, and $599,375 for 1886, for the payment of State salaries, and other State government expenses, for those years. This section contained a proviso that no payments should be made to counties under the swamp-land act, as amended by that Legislature, as before set forth, "until a tax is levied and collected for that purpose." That amendatory act, although ordered to take immediate effect, was passed but a few days before, and it is not claimed, and could not be claimed, that it had set apart any portion of the existing general fund for any such purpose, if it was competent to do so under the appropriation laws which raised it. This general appropriation law of 1885, after this prohibition in section 1, proceeded to provide for a special tax for the spe-

cific purpose of paying to the counties the sums due them under the law of 1858, and section 2 is relied on, with its proviso, as furnishing that fund, and as authorizing the application now made to us. The proviso to that section, following the general and usual directions to the Auditor General as to the apportioning the State tax levy among the counties, reads as follows:

"And provided further, that there shall be levied and collected in the same way as herein provided, and in addition to the sums hereinbefore named, the further sum of fifty-seven thousand three hundred and thirty-three and two-thirds of a dollar, for the year eighteen hundred and eighty-six, and a like sum each year for five successive years thereafter, to pay the amount now due to the counties, as provided for in said section fifty-three hundred and ninety-four, and denominated therein as a 'Swamp-Land Fund.'"

This section is as numbered by Howell, and is section 5 of the swamp-land law of 1858.

Under this proviso in section 2 of the appropriation bill of 1885, the sum mentioned was levied in 1886, and collected with the other State taxes, but how much of it was actually realized does not appear.

On April 27, 1887, the supervisors of Sanilac drew an order on the State Treasurer for the moneys in the State Treasurer's hands belonging to the county. A copy of this order is not given, but it was meant to cover any money in his hands. He referred it to the Auditor General, who refused to draw his warrant. In the letter of refusal it was stated that no apportionment had been made, and the Auditor's office had no *data* for making one, and it did not appear that the Auditor was the proper officer to make it.

On the sixth of June, 1887, an act was passed, which, as published, appears to have been given immediate effect, requiring the Auditor General to credit back to the counties the money apportioned for collection for interest on the swamp-land fund. It is claimed this act had not been

given immediate effect under the Constitution, and did not become operative until 90 days after the close of the session, which was 20 days after this application was sworn to on the seventh of September. The application was filed, and order to show cause granted, October 4, 1887, after all the session laws became operative, and the dates do not seem to be very important, if the State can pass such a law at all.

The practical importance of this case has led us to consider it in all the bearings suggested on the argument, and we are unable to find any ground on which we can issue the writ prayed for. There are difficulties touching both right and remedy.

If we consider the county in its corporate capacity as the intended beneficiary, which is at least not clear, the legislation up to 1885 was nothing more than an intended gift not carried out. It was in no sense a contract, for there was nothing to base a contract upon. A gift resting merely in intention, even though accompanied by a promise, could not be enforced against an individual, and is still less binding on the public. There can be no question of the right to recall any merely proposed gift so long as it remains in the hands of the giver. Had the State made provision whereby it was the express duty of a State officer to pay over the money, there would perhaps be a remedy to compel it, so long as the State left the law unchanged.

But there can be no doubt of the power of the State Legislature to refuse to perform even a contract, and, where it forbids the application of money in the State treasury to any particular use, no court can interfere. The State is not liable to suit except as it authorizes a suit, and this authority can be revoked at pleasure. This is such elementary doctrine that it only needs statement. Our own decisions, and those of the United States Supreme Court cited on the argument, dispose of any question of that sort.

The act of 1887 expressly requires the taxes which had

been collected for the counties to be credited back to the counties where they were levied, and the State officers have no power to make any other use of this money.

There is also much force in the claim that none of the laws, from 1858 down, have furnished the means of securing the collection and distribution of this fund, or have made it the express duty of any one, enforcible by the courts, to proceed in the business efficiently.

But we need not dwell upon this. The law of 1887 requiring these taxes to be refunded, while it gives no reasons, leads to a plain inference that for some reason or other the Legislature regarded them as improper or illegal, and it makes no difference which. Possibly both reasons existed. It was certainly a peculiar practice to compel the whole State, which is forbidden to engage in internal improvements except in applying land grants, to raise money to be expended by particular counties in local improvements.

But, however this may be, there can be no question whatever that the law of 1885 was void on other grounds. The title of the act, according to our Constitution, limited its object to the appropriations for the expenses of the State officers and State government for the years 1885 and 1886, and to provide a tax for the payment of the same. The second section proviso is designed to raise money to pay an old debt,—if it can be called a debt,—including arrearages for 27 years, and having nothing to do with the expenses of the State government for the two years in question. The Legislature, in the act itself, declared that this formed no part of the governmental appropriation, when, after providing for taxes to a specified amount for each of those years, they prohibited the use of any moneys for the counties until a tax should be levied for that particular purpose. And when they determined, by some process not pointed out, but probably on information from the departments, how much the arrearages amounted to, they went on to divide them into six

installments of $57,333.66 each, and required that sum to be raised each year for six successive years, beginning with 1886. All of this was clearly outside of anything in the title of the act. The tax thus collected was illegally collected, and was properly refunded on that account. But the courts could not compel it to be retained or paid over to the counties against the direction of the Legislature, whether rightly or wrongly withheld from them.

The difficulties in the way of our interference are, therefore, substantial as well as formal. The State does not owe this money to the county of Sanilac, and the respondent has no right to pay it over.

The *mandamus* must be denied. From the peculiar nature of the dispute we do not feel disposed to award costs.

The other Justices concurred.