COUNTY ROAD ASSOCIATION OF MICHIGAN v GOVERNOR

Docket Nos. 288653 and 288691. Submitted December 8, 2009, at Lansing. Decided January 12, 2010, at 9:00 a.m.

The County Road Association of Michigan and the Chippewa County Road Commission brought an action in the Ingham Circuit Court, William E. Collette, J., against the Governor, the state, and various state agents and agencies, seeking to prevent or reverse the transfer, pursuant to executive order of the Governor, of certain revenue funds from the Michigan Transportation Fund to the state's general fund or various state departments in fiscal year 2001-2002 that were allegedly restricted from being transferred by Const 1963, art 9, § 9. Plaintiffs then amended their complaint to include allegations concerning fiscal year 2002-2003. The Michigan Public Transit Association and others intervened. Plaintiffs moved for a preliminary injunction with regard to certain transfers, which the trial court granted in part. Defendants appealed that order by leave granted, and the Court of Appeals reversed the injunction in part in an unpublished opinion per curiam, issued January 13, 2004 (Docket No. 245931). Plaintiffs also moved for a preliminary injunction with respect to the transfer of certain other funds, and the trial court granted the motion. Defendants appealed that order by leave granted, and the Court of Appeals vacated the preliminary injunction and remanded the matter to the circuit court for the entry of a judgment in favor of defendants. 260 Mich App 299 (2004). On application by the intervenors for leave to appeal, the Supreme Court ordered oral argument on the application, then affirmed the judgment of the Court of Appeals and remanded the matter to the circuit court for the entry of a judgment in favor of defendants. 474 Mich 11 (2005). After the appeals regarding the preliminary injunctions were resolved, the case proceeded to a bench trial. The trial court ordered the restoration of certain transferred funds and required the state to perform a new cost-allocation study to determine the cost of collecting certain constitutionally dedicated revenues. The trial court also denied any unaddressed pending motions, including defendants' motion for summary disposition that alleged that plaintiffs lacked standing to pursue the cause of action. Plaintiffs

and defendants appealed the trial court's final opinion and order, and the Court of Appeals consolidated the appeals.

The Court of Appeals *held*:

1. Plaintiffs lack standing to pursue this cause of action.

2. The County Road Association of Michigan would have standing to bring this suit in the interest of its members if the members had standing as individual plaintiffs. However, its members lack standing.

3. Plaintiffs failed to establish that they suffered an injury in fact because they have not indicated that they suffered a particularized injury. The injury plaintiffs allege, that they received reduced distributions from the Michigan Transportation Fund and related funds, does not constitute an injury that is distinct from that suffered by the public at large.

4. Plaintiffs failed to establish that a causal connection exists between an injury and the conduct complained of, namely, a reduction in the distribution of Michigan Transportation Fund revenues to the county road commissions. Plaintiffs failed to satisfy the constitutional test for standing set forth in *Lee v Macomb Co Bd of Comm'rs*, 464 Mich 726 (2001), and *Lujan v Defenders of Wildlife*, 504 US 555 (1992), and therefore have not established standing in this case.

5. Even if plaintiffs' lack of standing were not at issue, this cause of action would still be barred by the doctrine of sovereign immunity. All defendants in this case are state agents and agencies that are subject to sovereign immunity. The state has not waived its immunity and consented to be sued in this type of lawsuit by either an act of the Legislature or through the constitution. The trial court's order must be vacated and the case must be remanded to the trial court for dismissal of the cause of action.

Vacated and remanded for dismissal.

1. ACTIONS — STANDING.

Standing is not established by a party by merely indicating a subjective interest in the litigation; instead, a party must demonstrate an interest in the litigation that is distinct from that of the general public; standing requires a demonstration that the plaintiff's substantial interest will be detrimentally affected in a manner different from the citizenry at large.

2. ACTIONS — STANDING — ELEMENTS.

The irreducible constitutional minimum of standing contains three elements; first, the plaintiff must have suffered an injury in fact,

which is an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical; second, there must be a causal connection between the injury and the conduct complained of, that is, the injury has to be fairly traceable to the challenged action of the defendants and not the result of the independent action of some third party not before the court; third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision; the party invoking jurisdiction bears the burden of establishing these elements.

3. ACTIONS — SOVEREIGN IMMUNITY — WAIVER OF IMMUNITY.

The state can only waive its immunity from suit and consent to be sued through an act of the Legislature or through the constitution.

4. GOVERNMENTAL IMMUNITY — CONSTITUTIONAL LAW.

Governmental immunity generally is not available in a state court action where it is alleged that the state violated a right conferred by the state constitution; a constitutional mandate to use transportation-related taxes and fees for transportation-related purposes does not necessarily constitute a right conferred by the state constitution.

*Levine Law Group, PLLC* (by *Michael C. Levine*), for plaintiffs.

*Michael A. Cox*, Attorney General, *B. Eric Restuccia*, Solicitor General, and *John F. Szczubelek*, Assistant Attorney General, for defendants.

Before: TALBOT, P.J., and O'CONNELL and DAVIS, JJ.

O'CONNELL, J. This case arises from plaintiffs' opposition to decisions by defendants, state agents and agencies, to reallocate certain revenues in fiscal years 2001-2002 and 2002-2003 in an attempt to balance the state budget. Plaintiffs filed suit to prevent the transfer of these funds, claiming that they were constitutionally dedicated. After a bench trial, the Ingham Circuit Court ordered the restoration of certain transferred funds and required the state to perform a new cost-allocation

study to determine the cost of collecting certain constitutionally dedicated revenues. Both plaintiffs and defendants appealed this order, and we consolidated the appeals. We conclude that plaintiffs lack standing to pursue this cause of action and, therefore, we vacate the trial court's order and remand for dismissal of this cause of action.

Plaintiff County Road Association of Michigan (CRAM) is a nonprofit corporation that represents the interests of the county road commissions or public works departments in all 83 Michigan counties.[1] The county road commissions receive distributions from the constitutionally mandated Michigan Transportation Fund (MTF) to maintain and construct roads within their respective counties.

On November 6, 2001, Governor John Engler issued Executive Order No. 2001-9, which was designed to reduce state expenditures by approximately $319 million.[2] One component of this executive order involved the transfer of approximately $144 million from various revenue funds to the state's general fund in the upcoming fiscal year.

---

[1] Although plaintiff Chippewa County Road Commission apparently is a member of CRAM, it is listed as a separate plaintiff in this cause of action. Wayne County does not have a county road commission; apparently, it is the only county in Michigan in which the county's Department of Public Services oversees the county roads. The Wayne County Department of Public Services receives distributions from the Michigan Transportation Fund for road maintenance and related programs within Wayne County and is a member of CRAM.

[2] Pursuant to Const 1963, art 5, § 20, the Governor, with the approval of the appropriating committees in both houses of the Legislature, has the authority to reduce state expenditures when actual revenues for a fiscal year are expected to fall below the estimated revenues on which the appropriations for that fiscal year are based. In this case, the relevant appropriations committees in both houses of the Legislature concurred with the executive order in question.

Soon after this executive order was issued, plaintiffs filed a cause of action against the Governor and various state agents and agencies challenging the transfer of funds from the MTF on constitutional grounds. In particular, plaintiffs challenged the transfer of $40 million from the MTF to the Department of State (DOS), resulting in a transportation budget of $95.814 million for the 2001-2002 fiscal year, claiming that this transfer, combined with the amount previously appropriated to the DOS, created a total appropriation to the DOS that was in excess of what was necessary to cover expenses incurred in the collection of motor vehicle registration taxes and fees. In an amended complaint filed after the beginning of the 2002-2003 fiscal year, plaintiffs challenged the appropriation of $94.5 million from the MTF to the DOS, arguing that this appropriation also was more than was necessary to cover expenses for the collection of motor vehicle registration taxes and fees. Further, plaintiffs claimed that certain revenue that the DOS derived from the sale of data and information amassed from MTF funds must be used for transportation purposes.

Plaintiffs also challenged the transfer of $8 million from the MTF to the Department of Treasury (Treasury), claiming that this transfer was also "in excess of the expenses necessary for collection of specific taxes on motor vehicle and aviation fuels and that portion of the general sales tax imposed on motor vehicle fuel, parts and accessories designated by constitution for restricted transportation purposes." Further, plaintiffs challenged the appropriation of $10.225 million from the MTF to the Treasury for the 2002-2003 fiscal year, arguing that this appropriation was also "in excess of expenses necessary for collection of motor vehicle registration taxes and fees."

Further, plaintiffs challenged the transfer to the state general fund of $12.75 million of sales tax revenue appropriated to the Comprehensive Transportation Fund (CTF), as well as the transfer to the general fund of $2.25 million of revenue acquired from the issuance of operator's licenses and originally appropriated to the Transportation Economic Development Fund (TEDF), arguing that the Governor lacked the authority to reappropriate or transfer these funds by executive order and without appropriation by the Legislature because the use of these funds is restricted by Article 9, § 9 of the Michigan Constitution.

Plaintiffs also maintained that "[t]he Chippewa County Road Commission and all 83 Michigan counties have received reduced distributions from restricted transportation funds because of the improper transfers of restricted transportation funds as alleged." They asked not only that the funds that they claimed were improperly transferred from the MTF, CTF, and TEDF be transferred back, but they also requested that the Governor's reappropriation of these funds be declared unconstitutional and that the court "[e]njoin the Defendants from using MTF funds for purposes other than those permitted by Article IX § 9 and statute."

About the time plaintiffs filed their second complaint, they moved to enjoin the transfer of $40 million to the DOS or the state general fund for the fiscal year 2002-2003, which would be used to cover expenses incurred in the collection of sales taxes. The trial court granted their motion in part, issuing a preliminary injunction precluding defendants from transferring $20 million from the MTF to cover expenses incurred in the collection of sales taxes, determining that only $20 million of the disputed amount constituted unnecessary collection expenses. Defendants asked for and were

granted leave to challenge the injunction on appeal, and this Court reversed the injunction in part.[3] *Co Rd Ass'n of Michigan v Governor*, unpublished opinion per curiam of the Court of Appeals, issued January 13, 2004 (Docket No. 245931).

Plaintiffs also moved for, and the trial court granted, a preliminary injunction precluding defendants from transferring funds from the CTF to the DOS, Treasury, or state general fund, as appropriated by Executive Order No. 2001-9, or restoring these funds if already transferred. This Court granted leave to appeal, vacated the preliminary injunction, and remanded the matter to the circuit court for entry of a judgment in favor of the defendants.[4] *Co Rd Ass'n of Michigan v Governor*, 260 Mich App 299; 677 NW2d 340 (2004). Our Supreme Court affirmed this Court's decision, finding that certain sales tax revenues were not constitutionally dedicated for transportation-related purposes pursuant to

---

[3] This Court reversed the injunction with respect to amounts that plaintiffs claimed were overcharged sales tax collection expenses, noting that Const 1963, art 9, § 9 permits "the deduction of 'necessary collection expenses' in obtaining tax revenue that it otherwise dedicates to transportation purposes" and does not otherwise preclude the use of MTF allocations to collect these taxes if the collection of these taxes "incidentally further[s] other governmental functions." *Co Rd Ass'n of Michigan v Governor*, unpublished opinion per curiam of the Court of Appeals, issued January 13, 2004 (Docket No. 245931), at 3. This Court upheld the injunction with respect to the amount that the DOS charged the MTF "[w]ith respect to the cost of processing automobile dealer licensing, driver improvement programs, and driver's license appeals," because the DOS apparently alleged that it considered the funds used for these activities "necessary collection expenses," but did not explain "how the costs for these activities could possibly be reasonably characterized as expenses incurred in the collection of sales taxes." *Id.*, unpub op at 3-4.

[4] Defendants never raised the issue of standing when they sought leave to appeal the issuance of any of these injunctions and, accordingly, leave was never granted with respect to the issue of standing. Accordingly, this Court was not in a position to address standing in the earlier interlocutory appeals in this case.

Const 1963, art 9, § 9 and, therefore, were properly subject to the Governor's authority to reduce state expenditures. *Co Rd Ass'n of Michigan v Governor*, 474 Mich 11; 705 NW2d 680 (2005).

After the appeals concerning the preliminary injunction were resolved, this case proceeded to a bench trial. Proofs were presented, and the trial court issued a final opinion and order. In its final order, the trial court ordered that the state return $7.3 million from the general fund to the MTF to restore funds improperly appropriated or transferred to the DOS in fiscal year 2001-2002 to fund driver's license appeals, driver improvement programs, and licensing of automobile dealers, and to return $6.5 million to the MTF to restore funds improperly appropriated to the DOS for these purposes in fiscal year 2002-2003. The trial court then ordered that the state perform a new cost-allocation study that would reflect current costs associated with sales tax collections, apparently to govern future cost allocations. The trial court denied plaintiffs' claim that revenue generated from the sale of data amassed using MTF funds should be restricted to transportation-related uses, dismissed with prejudice all claims that it had not addressed (including defendants' claims regarding standing and immunity), and denied all unaddressed pending motions.

Surprisingly, however, the trial court never ruled on the issue of standing until it issued its final opinion and order in this case, although the issue had first been raised early on in these proceedings. Defendants first raised the issue in a motion for summary disposition filed in May 2002. Although plaintiffs filed a response to that motion in June 2002 and the trial court entertained a discussion on the issue during a motion hearing shortly thereafter, the trial court never issued an

order on the motion. Defendants resurrected their motion for summary disposition in January 2007, again claiming that plaintiffs lacked standing. Plaintiffs again responded, and the parties argued the issue at a motion hearing before the trial court. However, the trial court declined to address the issue until after it heard the proofs at trial, and defendants did not have an order regarding standing from which to appeal. After a bench trial, in its final order, the trial court summarily denied this motion for summary disposition in conjunction with all other unaddressed pending motions. It never indicated the reason for its decision on the record.

However, we conclude that plaintiffs' standing to bring this cause of action is the key issue in this case, and we agree with defendants' position that plaintiffs have failed to establish standing. For this reason, we vacate the trial court's order and remand for dismissal of this cause of action.[5]

Our Supreme Court has recognized that standing is essential to ensure a party's interest in the outcome of litigation, in order to ensure sincere and vigorous advocacy. *House Speaker v Governor*, 443 Mich 560, 572; 506 NW2d 190 (1993). Further, ensuring that a party has standing to present a case is essential to preserving the constitutional separation of powers. *Nat'l Wildlife Federation v Cleveland Cliffs Iron Co*, 471 Mich 608, 612; 684 NW2d 800 (2004). In *Lee v Macomb Co Bd of Comm'rs*, 464 Mich 726, 735-738; 629 NW2d 900 (2001), our Supreme Court explained the importance of ensuring that a party had standing to present a case or controversy, in order to prevent usurpation of legislative and executive powers by the judicial branch:

---

[5] The question of a party's legal standing is one of law that we review de novo. *American Family Ass'n of Michigan v Michigan State Univ Bd of Trustees*, 276 Mich App 42, 44-45; 739 NW2d 908 (2007).

It is important, initially, to recognize that in Michigan, as in the federal system, standing is of great consequence so that neglect of it would imperil the constitutional architecture whereby governmental powers are divided between the three branches of government.

Standing, as a requirement to enter the courts, is a venerable doctrine in the federal system that derives from US Const, art III, § 1, which confers only "judicial power" on the courts and from US Const, art III, § 2's limitation of the judicial power to "Cases" and "Controversies." In several recent cases, the United States Supreme Court has discussed the close relationship between standing and separation of powers. In *Lewis v Casey*, 518 US 343, 349; 116 S Ct 2174; 135 L Ed 2d 606 (1996), Justice Scalia, writing for the majority, said:

"[T]he doctrine of standing [is] a constitutional principle that prevents courts of law from undertaking tasks assigned to the political branches. It is the role of courts to provide relief to claimants, in individual or class actions, who have suffered, or will imminently suffer, actual harm; it is not the role of courts, but that of the political branches, to shape the institutions of government in such fashion as to comply with the laws and the Constitution." [Citations omitted.]

*Lewis* was foreshadowed in *Lujan v Defenders of Wildlife*, 504 US 555, 559-560; 112 S Ct 2130; 119 L Ed 2d 351 (1992), where Justice Scalia, again speaking for the Court, explained:

"[T]he Constitution's central mechanism of separation of powers depends largely upon common understanding of what activities are appropriate to legislatures, to executives, and to courts. . . . One of those landmarks, setting apart the 'Cases' and 'Controversies' that are of the justiciable sort referred to in Article III—'serv[ing] to identify those disputes which are appropriately resolved through the judicial process,'—is the doctrine of standing. Though some of its elements express merely prudential considerations that are part of judicial self-government, the

core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III." [Citations omitted.]

* * *

In Michigan, standing has developed on a track parallel to the federal doctrine, albeit by way of an additional constitutional underpinning. In addition to Const 1963, art 6, § 1 which vests the state "judicial power" in the courts, Const 1963, art 3, § 2 expressly directs that the powers of the legislature, the executive, and the judiciary be separate. Concern with maintaining the separation of powers, as in the federal courts, has caused this Court over the years to be vigilant in preventing the judiciary from usurping the powers of the political branches. Early on, the great constitutional scholar Justice THOMAS M. COOLEY discussed the concept of separation of powers in the context of declining to issue a mandamus against the Governor in *Sutherland v Governor*, 29 Mich 320, 324 (1874):

"Our government is one whose powers have been carefully apportioned between three distinct departments, which emanate alike from the people, have their powers alike limited and defined by the constitution, are of equal dignity, and within their respective spheres of action equally independent. One makes the laws, another applies the laws in contested cases, while the third must see that the laws are executed. This division is accepted as a necessity in all free governments, and the very apportionment of power to one department is understood to be a prohibition of its exercise by either of the others. The executive is forbidden to exercise judicial power by the same implication which forbids the courts to take upon themselves his duties."

However, standing is not established by merely indicating a subjective interest in the litigation; instead, a party must demonstrate an interest in the litigation

that is distinct from that of the general public. In *House Speaker*, our Supreme Court explained:

> The concept of standing represents a party's interest in the outcome of litigation that ensures sincere and vigorous advocacy. However, a commitment to vigorous advocacy alone is not enough. Rather, "[s]tanding requires a demonstration that the plaintiff's substantial interest will be detrimentally affected in a manner different from the citizenry at large." [*House Speaker, supra* at 572 (citation omitted).]

Although our Supreme Court's view of the circumstances needed to establish standing has been indeterminate in the past, see *Detroit Fire Fighters Ass'n v Detroit*, 449 Mich 629; 537 NW2d 436 (1995), in 2001 in *Lee* our Supreme Court adopted the test for standing articulated by the United States Supreme Court in *Lujan v Defenders of Wildlife*, 504 US 555, 559-560; 112 S Ct 2130; 119 L Ed 2d 351 (1992). The *Lujan* test held:

> "[T]he irreducible constitutional minimum of standing contains three elements. First, the plaintiff must have suffered an 'injury in fact'—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) 'actual or imminent, not "conjectural" or "hypothetical.' " Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be 'fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court.' Third, it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'
>
> "The party invoking . . . jurisdiction bears the burden of establishing these elements." [*Lee, supra* at 739-740, quoting *Lujan, supra* at 560-561 (citations omitted).]

In adopting the *Lujan* test, our Supreme Court explained, "[T]he *Lujan* test has the virtues of articulating clear criteria and of establishing the burden of

demonstrating these elements. Moreover, its three elements appear to us to be fundamental to standing; the United States Supreme Court described them as establishing the 'irreducible constitutional minimum' of standing."[6] *Lee, supra* at 740.

In *Nat'l Wildlife, supra* at 614-617, our Supreme Court reaffirmed its holding in *Lee* and, more importantly, explained both how and why a plaintiff must have a particularized injury in order to establish standing:

> The "judicial power" has traditionally been defined by a combination of considerations: the existence of a real dispute, or case or controversy; the avoidance of deciding hypothetical questions; the plaintiff who has suffered real harm; the existence of genuinely adverse parties; the sufficient ripeness or maturity of a case; the eschewing of cases that are moot at any stage of their litigation; the ability to issue proper forms of effective relief to a party; the avoidance of political questions or other non-justiciable controversies; the avoidance of unnecessary constitutional

---

[6] When adopting the *Lujan* test to the facts of the case, the *Lee* Court determined that the plaintiffs failed to establish an injury in fact and, therefore, lacked standing. In *Lee*, the plaintiffs, who had not sought relief under the soldiers' relief fund act, MCL 35.21 *et seq.*, had filed a cause of action to compel the Macomb County Board of Commissioners to establish a veterans' relief fund in accordance with the act. *Lee, supra* at 729. The plaintiffs had merely argued that "they 'should receive' and 'should have received, the benefit of the property tax levy required by MCL 35.21,' and that the failure to levy and collect the tax set forth in the soldiers' relief fund act 'has caused, and continues to cause, plaintiffs great harm and damage.' " *Id.* at 740. The *Lee* Court concluded that even if these assertions of wrongdoing were accepted as true, they could not satisfy the "injury in fact" requirement of standing because the plaintiffs had merely claimed that they suffered " 'great harm and damage' " as a result of the failure of the board of commissioners to levy the requested tax and, consequently, it was not "readily apparent how the collection of a tax pursuant to the act would have benefitted plaintiffs in a concrete and particularized manner." *Id.*

issues; and the emphasis upon proscriptive as opposed to prescriptive decision making.

Perhaps the most critical element of the "judicial power" has been its requirement of a genuine case or controversy between the parties, one in which there is a real, not a hypothetical, dispute, *Muskrat v United States*, 219 US 346; 31 S Ct 250; 55 L Ed 246 (1911), and one in which the plaintiff has suffered a "particularized" or personal injury. *Massachusetts v Mellon*, 262 US 447, 488; 43 S Ct 597; 67 [L Ed] 1078 (1923). Such a "particularized" injury has generally required that a plaintiff must have suffered an injury distinct from that of the public generally. *Id.*

Absent a "particularized" injury, there would be little that would stand in the way of the judicial branch becoming intertwined in every matter of public debate. If a taxpayer, for example, opposed the closing of a tax "loophole" by the Legislature, the legislation might be challenged in court. If a taxpayer opposed an expenditure for a public building, that, too, might be challenged in court. If a citizen disagreed with the manner in which agriculture officials were administering farm programs, or transportation officials' highway programs, or social services officials' welfare programs, those might all be challenged in court. If a citizen opposed new prison disciplinary policies, that might be challenged in court.

In each instance, the result would be to have the judicial branch of government—the least politically accountable of the branches—deciding public policy, not in response to a real dispute in which a plaintiff had suffered a distinct and personal harm, but in response to a lawsuit from a citizen who had simply not prevailed in the representative processes of government. To allow the judiciary to carry out its responsibilities in this manner is to misperceive the "judicial power," and to establish the judicial branch as a forum for giving parties who were unsuccessful in the legislative and executive processes simply another chance to prevail. To allow this authority in the judiciary would also be to establish the judicial branch as first among equals, being permitted to monitor and supervise the other branches,

and effectively possessing a generalized commission to evaluate and second-guess the wisdom of their policies. As the United States Supreme Court observed in *Mellon*:

"The administration of any statute . . . is essentially a matter of public and not of individual concern. . . . The party who invokes the [judicial] power must be able to show not only that the statute is invalid but that he has sustained or is immediately in danger of sustaining some direct injury as the result of its enforcement, and not merely that he suffers in some indefinite way in common with the people generally. . . . To [allow standing under a different understanding] would be not to decide a judicial controversy, but to assume a position of authority over the governmental acts of another and co-equal department, an authority which we plainly do not possess." [*Id.* at 487-489.]

. . . As the United States Supreme Court observed in *Lujan* [*supra* at 576-577]:

"Vindicating the *public* interest (including the public interest in Government observance of the Constitution and laws) is the function of the Congress and the Chief Executive. . . . To permit Congress to convert the undifferentiated public interest in executive officers' compliance with the law into an 'individual right' vindicable in the courts is to permit Congress to transfer from the President to the courts the Chief Executive's most important constitutional duty, to 'take Care that the Laws be faithfully executed,' Art II, § 3. It would enable the courts, with the permission of Congress, 'to assume a position of authority over the governmental acts of another and co-equal department,' and to become 'virtually continuing monitors of the wisdom and soundness of Executive action.['] We have always rejected that vision of our role . . . ." [Citations omitted; emphasis in original.]

"We must as judges recall that, as Mr. Justice Holmes wisely observed, the other branches of Government 'are ultimate guardians of the liberties and welfare of the people in quite as great a degree as the courts.'" *Flast v Cohen*, 392 US 83, 131; 88 S Ct 1942; 20 L Ed 2d 947 (1968)

(Harlan, J., dissenting), quoting *Missouri, Kansas & Texas R Co v May*, 194 US 267, 270; 24 S Ct 638; 48 L Ed 971 (1904).

In *Nat'l Wildlife, supra* at 630, our Supreme Court recognized that because the question of standing is a fundamental jurisdictional question and "a matter that may be raised at any time," the burden that must be met to establish that standing exists increases over the course of the proceeding. In *Nat'l Wildlife, supra* at 630-631, our Supreme Court, quoting *Lujan, supra* at 561, explained:

> "The party invoking federal jurisdiction bears the burden of establishing these elements [i.e., injury in fact, causation, redressibility]. Since they are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation. At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we 'presume that general allegations embrace those specific facts that are necessary to support the claim.' In response to a summary judgment motion, however, the plaintiff can no longer rest on such 'mere allegations,' but must 'set forth' by affidavit or other evidence 'specific facts,' which for purposes of the summary judgment motion will be taken to be true. And at the final stage, those facts (if controverted) must be 'supported adequately by the evidence adduced at trial.' " [Citations omitted.]

Thus, a plaintiff must include in the pleadings "general factual allegations" that injury will result from the defendant's conduct. If the defendant brings a motion for summary disposition, the plaintiff must further support the allegations of injury with documentation, just as he has to support the other allegations that make up his claim. Finally, when the matter comes to trial, the plaintiff must

sufficiently support his claim, including allegations of injury, to meet his burden of proof. [*Nat'l Wildlife, supra* at 630-631.]

In *Michigan Ed Ass'n v Superintendent of Pub Instruction*, 272 Mich App 1, 5; 724 NW2d 478 (2006) (*MEA*), this Court, recognizing the clarity that our Supreme Court's holdings in *Lee* and *Nat'l Wildlife* provided with regard to the question of standing, held that even when a plaintiff had statutory standing to file a suit, that plaintiff must also establish that it meets the constitutionally imposed minimum requirements for standing set forth in *Lee* and *Lujan*. In *MEA*, the Michigan Education Association (MEA) filed suit to challenge the expenditure of funds by Bay Mills Community College (BMCC) to authorize charter schools. *Id.* at 3. The MEA claimed that because these charter schools were not public schools, the expenditure of funds to authorize these schools violated the state constitutional provision prohibiting public funding for nonpublic schools. *Id.* at 4. Although this Court concluded that MCL 600.2041(3) and MCR 2.201(B)(4) conferred standing on the MEA, the MEA still needed to satisfy the constitutional requirements in *Lujan* and *Lee* in order to establish standing. *Id.* at 12-13.

The MEA lacked standing in the case because it did not establish any of the elements of constitutional standing. This Court explained:

First, plaintiff has neither alleged nor suffered the required "injury in fact." Plaintiff presented no evidence that it suffered an invasion of a legally recognized interest that is actual or imminent, not hypothetical or conjectural. Specifically, our review of the record reveals that plaintiff provides nothing beyond bare assertions that the public funding of BMCC's charter schools injures plaintiff's members, and does not identify an injury that is " 'concrete and particularized,' " and " ' "actual or imminent." ' " *Nat'l*

*Wildlife, supra* at 628, quoting *Lee, supra* at 739, quoting *Lujan, supra* at 560. Any alleged injury to plaintiff is based on conjecture and speculation.

Second, plaintiff has provided us nothing more than the simple assertion that BMCC's public funding reduces plaintiff's members' wages without any supporting evidence. While we can envision a scenario in the abstract in which BMCC's public funding does indirectly or even directly reduce the wages or wage increases of plaintiff's members, it takes more than imagination to establish the required causation element of standing. *Nat'l Wildlife, supra* at 628-629, quoting *Lee, supra* at 739, quoting *Lujan, supra* at 560.

Third, plaintiff has provided no substantive evidence that the alleged harm could even be " ' "redressed by a favorable decision." ' " *Nat'l Wildlife, supra* at 629, quoting *Lee, supra* at 739, quoting *Lujan, supra* at 561. Plaintiff offers no evidence to show that it is " ' "likely," ' " or even merely " ' "speculative," ' " that, if all public funds to BMCC schools are cut off, plaintiff's members' salaries will increase. *Nat'l Wildlife, supra* at 629, quoting *Lee, supra* at 739, quoting *Lujan* at 561. There is absolutely no way to predict with any degree of certainty how the public dollars earmarked for BMCC schools would be appropriated if BMCC funding was discontinued. Plaintiff has provided no evidence whatsoever that these monies would be directly funneled into plaintiff's members' salaries. Moreover, there is another possible scenario. Even if plaintiff were to prevail, the BMCC schools might switch to a different chartering organization, such as a school district or local community college, where they would again be eligible for public funding. Plaintiff has not provided, and we cannot ascertain, any means of redress by a favorable decision of this Court. *Nat'l Wildlife, supra* at 629. [*MEA, supra* at 5-7.]

In *American Family Ass'n of Michigan v Michigan State Univ Bd of Trustees*, 276 Mich App 42; 739 NW2d 908 (2007), the plaintiff, a nonprofit corporation organized " 'to promote the welfare of children through the

promotion and preservation of the traditional family,' "
challenged Michigan State University's (MSU's) policy
of providing benefits to same-sex partners, "alleging
that this policy constitutes an illegal expenditure of
state funds to define and recognize same-sex domestic
partnerships in violation of [Const 1963, art 1, § 25] and
state law governing marriage and divorce as set forth in
MCL 551.1 *et seq.*" *Id.* at 43-44. The plaintiff claimed
that MSU's benefits policy advanced an interest con-
trary to the plaintiff's mission and was at odds with the
policies that the plaintiff sought to promote. *Id.* at 44.

In addressing whether the plaintiff had standing to
raise this issue, the *American Family* Court recognized
that our Supreme Court had adopted the *Lujan* test for
standing. *Id.* at 46. It also addressed our Supreme
Court's holdings in *Lee* and *Nat'l Wildlife*, observing
that in these cases our Supreme Court had recognized
that failure to ensure that a party had standing to
decide a particular issue would alter the function of
judicial review to the point where the constitutional
separation of powers would be threatened. *Id.* at 49.
The Court, *id.* at 51-53, then concluded:

> Here, as in *MEA*, plaintiff alleged that, as a Michigan
> nonprofit corporation organized for civic purposes, it has
> standing under MCL 600.2041 and MCR 2.201(B) to insti-
> tute the instant action. Plaintiff argues that our Supreme
> Court determined in *House Speaker* that the statutory
> grant of standing set forth in MCL 600.2041 and MCR
> 2.201(B)(4) is constitutional; therefore, it need not meet
> any additional requirements to establish standing. How-
> ever, as discussed earlier, *Lee* expressly stated that the
> *Lujan* test for standing was to "be seen as *supplementing*
> the holding in *House Speaker*, as well as [the] Court's
> earlier standing jurisprudence . . . ." *Lee, supra* at 740
> (emphasis added). And in *Nat'l Wildlife, supra* at 628-629,
> our Supreme Court reiterated and reaffirmed that plain-
> tiffs *must* allege an actual or imminent, concrete and

particularized injury to establish standing, irrespective of any statutory authorization for bringing suit. Thus, as this Court explained in *MEA*, our Supreme Court has made clear that the minimum requirements set forth in *Lee* and *Lujan* are an absolute prerequisite to establishing standing and that those requirements supplement—that is, augment or add to—the requirements set forth in *House Speaker*. Therefore, we conclude that the trial court properly determined that plaintiff was required to establish that it had suffered an actual or imminent, concrete and particularized invasion of a legally protected interest, distinct from that of the public generally, as a result of defendant's benefits policy in order to have standing to institute the instant action.

Plaintiff asserts that, even under such a test, it has alleged a sufficient injury by asserting that defendant's recognition of same-sex domestic partnerships for benefits purposes conflicts with plaintiff's stated interest in and purpose of promoting and preserving the traditional family, marriage, and the welfare of children. However, plaintiff offers only a bare assertion that it is being injured by defendant's benefits policy. Plaintiff did not present any evidence to establish that it or its members are directly affected by defendant's benefits policy in an individualized and particularized manner or that defendant's benefits policy detrimentally affects plaintiff's [" ']substantial interest . . . in a manner different from the citizenry at large.' " *Lee, supra* at 738-739, quoting *House Speaker, supra* at 554. Indeed, plaintiff's only alleged injury is that defendant's provision of benefits to same-sex domestic partners is "at odds with that which [plaintiff] seeks to promote." Plaintiff essentially complains that defendant's benefits policy is an affront to the values that plaintiff and its members espouse and promote.[5] Accordingly, plaintiff has not established that it suffered a concrete and particularized, actual or imminent injury distinct from that of the citizenry at large, as required by *House Speaker, Lujan,* and *Lee*. Thus, plaintiff did not meet its burden of establishing standing, irrespective of whether it satisfied MCL 600.2041 and MCR 2.201(B). *MEA, supra*.

[5] In contrast, perhaps, to students who might assert that their costs of attendance are increased by defendant's expenditure of funds to provide benefits to same-sex domestic partners, or to married recipients of those benefits who might assert that their cost of benefits is increased by that expenditure, plaintiff's asserted injury is no different from that which could be asserted by persons, groups, or entities whose values or beliefs lead them to oppose affording any recognition or status to same-sex relationships. The standing of students or benefit recipients such as we describe here in contrast to plaintiff is not, of course, at issue, and we express no opinion regarding their standing.

Initially, we note that we do not question the validity of CRAM's standing to bring this suit on behalf of its members. "Nonprofit organizations . . . have standing to bring suit in the interest of their members where such members would have standing as individual plaintiffs." *Nat'l Wildlife, supra* at 629. CRAM has standing if it alleges that its members (the county road commissions of the state of Michigan) suffered either an actual injury or an imminent injury. *Id.* Instead, we hold that CRAM's *members*, the county roads commissions and public works departments, lack standing.

First, plaintiffs have failed to establish that they suffered an "injury in fact" because they have not indicated that they suffered a particularized injury. In their complaint, plaintiffs claim that "[t]he Chippewa County Road Commission and all 83 Michigan counties have received reduced distributions from restricted transportation funds because of the improper transfers of restricted transportation funds as alleged." Although the parties extensively debated the appropriateness of the contested transfers of funds before the trial court, plaintiffs provided little evidence concerning the dam-

ages that the road commissions suffered as a result of
the reduction in funds. In their brief on appeal, plain-
tiffs respond to defendants' allegation that they did not
suffer an injury that is "distinct from the public at
large" by countering that they, not the public at large,
have a statutory duty to maintain and operate the
county road system and that they, not the public at
large, were injured when they lost their share of the
MTF funding to which they were entitled.

However, the injury plaintiffs allege—that they
received reduced distributions from the MTF and
related funds—does not constitute an injury that is
distinct from that suffered by the public at large.
First, our Supreme Court has long held that the
construction and maintenance of local roads is not a
local concern, but a matter of interest for the state at
large. *Moreton v Secretary of State*, 240 Mich 584, 588;
216 NW 450 (1927). Further, plaintiffs' claimed in-
jury is not distinct from that suffered by the public at
large. The county road commissions are public enti-
ties created for a public purpose, namely, to con-
struct, maintain, and operate designated roads within
a particular county for the benefit of the public. See
MCL 224.1 *et seq*. By receiving reduced distributions,
the county road commissions "suffered" the same
injury as that suffered by the public. With less money,
the county road commissions could not engage in as
many construction and maintenance projects, result-
ing in a direct injury to the public in the form of bad
roads. Although a lack of funding might hinder the
county road commissions' ability to fulfill their statu-
tory duty to maintain and operate the county road
system, it is the public that suffers as a result.
Plaintiffs fail to establish that they suffered an injury
distinct from the general public and, accordingly,

plaintiffs have failed to establish a particularized injury necessary to establish an injury in fact.

Further, plaintiffs have failed to establish that a causal connection exists between the injury and the conduct complained of, namely, a reduction in the distribution of MTF revenues to the county road commissions. Plaintiffs want this Court to assume that a reduced distribution of MTF funds to the county road commissions must have resulted in injury. This could be a reasonable assumption to make. However, because plaintiffs bear the burden of establishing standing, *Lee, supra,* it is reasonable to expect plaintiffs to provide more than a mere assumption of injury resulting from the alleged wrong to establish an element of constitutional standing. Assuming that plaintiffs received a lower allocation of MTF funds than expected, they still do not indicate how and to what extent this affected the county road commissions' budgets. For example, a county might have appropriated money to the county road commission to compensate for decreased MTF funding, perhaps by taking the money from existing funds or by passing a local tax levy for roads. Although such taxation or reappropriation of funds might hurt the county as a whole, a county road commission could not claim that it was harmed by the reduction in MTF funds if it received compensation for its loss in MTF funding from another source. Similarly, plaintiffs fail to explain how a decrease in money distributed into the other named funds resulted in a direct injury to the county road commissions. Consequently, plaintiffs have failed to satisfy the constitutional test set forth in *Lee* and *Lujan* and have not established standing in this case.

In addition, we note that even if plaintiffs' lack of standing were not at issue, this cause of action would still be barred by the doctrine of sovereign immunity. The question whether an entity has immunity is one of law, which we review de novo. *Ballard v Ypsilanti Twp*, 457 Mich 564, 567; 577 NW2d 890 (1998).

Michigan courts have long recognized that "[t]he State, as sovereign, is immune from suit save as it consents to be sued, and any relinquishment of sovereign immunity must be strictly interpreted." *Manion v State Hwy Comm'r*, 303 Mich 1, 19; 5 NW2d 527 (1942). "Sovereign immunity exists in Michigan because the state created the courts and so is not subject to them." *Pohutski v City of Allen Park*, 465 Mich 675, 681; 641 NW2d 219 (2002). See also *Sanilac Co Bd of Supervisors v Auditor General*, 68 Mich 659, 665; 36 NW 794 (1888) ("The state is not liable to suit except as it authorizes a suit, and this authority can be revoked at pleasure. This is such elementary doctrine that it only needs statement."). Although the terms "sovereign immunity" and "governmental immunity" have been used interchangeably, their meanings are different. *Ballard, supra* at 567. "Sovereign immunity refers to the immunity of the state from suit and from liability, while governmental immunity refers to the similar immunities enjoyed by the state's political subdivisions." *Id.* at 567-568. By being immune from suit, the state is immune from being "hailed into one of its courts without its consent." *Id.* at 568 n 1. The *Pohutski* Court noted:

> "*Sovereign* immunity is a specific term limited in its application to the State and to the departments, commissions, boards, institutions, and instrumentalities of the State. The reason is the State is the only sovereignty in our system of government, except as the States delegated part of their implicit sovereignty to the Federal government." [*Pohutski, supra* at 682, quoting *Myers v Genesee*

*Co Auditor*, 375 Mich 1, 6; 133 NW2d 190 (1965) (opinion by O'HARA, J.) (emphasis in original).][7]

All defendants in this cause of action are state agents and agencies. Accordingly, they are subject to sovereign immunity.

Michigan courts have also recognized that immunity from suit can only be waived by an act of the Legislature, *Ballard, supra* at 568, or through a constitutional provision, see *Durant v Michigan*, 456 Mich 175, 205 n 31; 566 NW2d 272 (1997). Because governmental immunity is a characteristic of government, a plaintiff must plead its case in avoidance of governmental immunity. *Mack v Detroit*, 467 Mich 186, 198; 649 NW2d 47 (2002).

Essentially, the state can only waive its immunity and, consequently, consent to be sued through an act of the Legislature or through the constitution. We have been unable to identify a statutory or constitutional provision under which the state has "consented" to this type of suit. The governmental tort liability act states:

> Except as otherwise provided in this act, a governmental agency is immune from tort liability if the governmental agency is engaged in the exercise or discharge of a governmental function. Except as otherwise provided in this act, this act does not modify or restrict the immunity of the

---

[7] In contrast, in *Myers*, Justice O'HARA explained how "sovereign immunity" had morphed into the broader concept of "governmental immunity," stating:

> "Over the years, by judicial construction, this 'sovereign' immunity has been transmogrified into 'governmental' immunity and made applicable to the 'inferior' divisions of government, *i.e.*, townships, school districts, villages, cities, and counties, but with an important distinction. These subdivisions of government enjoyed the immunity only when engaged in 'governmental' as distinguished from 'proprietary' functions." [*Pohutski, supra* at 682, quoting *Myers, supra* at 8-9.]

state from tort liability as it existed before July 1, 1965, which immunity is affirmed. [MCL 691.1407(1).]

However, this action does not sound in tort, because this is not an action for which plaintiffs seek, or can even directly acquire, relief. This Court has recognized that "[a] 'tort' is broadly defined as '[a] civil wrong for which a remedy may be obtained'. . . ." *Tate v Grand Rapids*, 256 Mich App 656, 660; 671 NW2d 84 (2003), quoting Black's Law Dictionary (7th ed). Plaintiffs claim that they are seeking a return of funds to the MTF and the TEDF, as well as injunctive relief that would govern future attempts to "unconstitutionally" transfer money away from these funds, but the wrongs that they assert do not provide them access to a remedy that they may directly obtain. Regardless, even if plaintiffs' cause of action did sound in tort, defendants' complained-of actions (implementing budgetary changes) constitute the discharge of a governmental function and, further, our Supreme Court has indicated that the governmental tort liability act was not designed to undermine " ' "the apparent assumption that the state and its agencies enjoyed a total sovereign immunity from tort liability . . . ." ' " *Pohutski, supra* at 687, quoting *Li v Feldt (After Remand)*, 434 Mich 584, 600-601; 456 NW2d 55 (1990) (GRIFFIN, J., concurring in part and dissenting in part) (citations omitted).

Certain other constitutional and statutory provisions also waive the state's sovereign immunity and permit plaintiffs to bring specific causes of action against the states. See, e.g., *Durant, supra* at 205 n 31 (noting that the Headlee Amendment included a waiver of sovereign immunity from taxpayer suits to enforce the amendment's provisions); *Burdette v Michigan*, 166 Mich App 406, 408; 421 NW2d 185 (1988) ("Article I, § 17 of the 1963 Michigan Constitution provides that the state may

not deprive a person of property without due process of law. Constitutional due process guarantees prohibit the state from taking property for nonpayment of taxes without proper notice and opportunity for a hearing."). However, no constitutional or statutory provisions waive the state's sovereign immunity from suits concerning these types of budgetary appropriations.

As a general rule, " 'governmental immunity is not available in a state court action where it is alleged that the state violated a right conferred by the state constitution.' " *Jones v Powell*, 227 Mich App 662, 673; 577 NW2d 130 (1998), aff'd 462 Mich 329 (2000), quoting *Marlin v Detroit*, 177 Mich App 108, 114; 441 NW2d 45 (1989). See also *Smith v Dep't of Pub Health*, 428 Mich 540, 544; 410 NW2d 749 (1987) ("Where it is alleged that the state, by virtue of custom or policy, has violated a right conferred by the Michigan Constitution, governmental immunity is not available in a state court action."). However, we do not believe that a constitutional mandate to use transportation-related taxes and fees for transportation-related purposes necessarily constitutes a "right conferred by the state constitution," especially when compared to the rights whose violation by the state was at issue in the cases in which this provision was applied. See *Duncan v Michigan*, 284 Mich App 246; 774 NW2d 89 (2009) (concerning the right to counsel); *Hinojosa v Dep't of Natural Resources*, 263 Mich App 537; 688 NW2d 550 (2004) (concerning an unconstitutional taking of property); *Jones, supra* (concerning tort claims arising from an entry into a home without a warrant).

Further, plaintiffs, who are local governmental entities, not individuals, do not even have the rights that they allege were violated. A right must be "conferred" *on* an entity, and we are not aware of any circumstance

under which a constitutional or statutory "right" can be conferred upon a governmental body, as opposed to an individual. In fact, the Michigan Constitution was designed and created for the benefit of the *people* of this state, not for the benefit of a municipality or a county road commission. See Const 1963, art 1, § 1 ("All political power is inherent in the people. Government is instituted for their equal benefit, security and protection."). Therefore, as we explained earlier in this opinion, even if the state's actions did constitute a violation of a right conferred by the constitution, it is the individual taxpayers of this state, not local governmental entities, who would have standing to challenge the violation of a right conferred by the state constitution.

Similarly, it appears that the state did not afford county road commissions and similar entities consent to file suit against it with regard to this type of claim. In *Oakland Co Bd of Co Rd Comm'rs v Michigan Prop & Cas Guaranty Ass'n*, 456 Mich 590; 575 NW2d 751 (1998), our Supreme Court, in the context of discussing whether a county road commission could raise an equal protection claim against the state, explained:

> [A]s a creation of the Legislature, the road commission cannot assert an equal protection challenge against its creator, the state. The county road law provides for the creation of a county road commission and defines the powers and duties of the commission. See MCL 224.1 *et seq.* . . . . A county road commission "draws its legal life from the county road law and, as a creature of that legislation, the commission has no power save that which is legislatively conferred." *Arrowhead Development Co v Livingston Co Rd Comm*, 413 Mich 505, 512; 322 NW2d 702 (1982). [*Id.* at 608.]

Although plaintiffs claim that *Oakland Co* only prevents a county road commission from bringing an equal protection claim against the state, the rationale pro-

vided in *Oakland Co* is equally applicable to a determination that county road commissions, as creatures of statute, cannot bring a constitutional claim against the state.

Plaintiffs also claim that immunity from suit does not exist in this case because, if it did exist, the legislative and executive branches would have unchecked power to transfer any and all revenue constitutionally dedicated to the MTF to any state fund for any purpose, rendering Const 1963, art 9, § 9 meaningless and undermining the intent of the people of this state. This argument incorrectly presupposes that only the judiciary has the power to prevent the legislative and executive branches from improperly appropriating funds dedicated in the constitution for a particular purpose. Plaintiffs forget that the people of this state have the power of the vote, and they can use the ballot box to remove from office elected members of the legislative and executive branches whose actions are contrary to the will of the people. The desire of the public to have properly maintained roads is perhaps the most powerful incentive for legislators and executive branch elected officials to not dip too much into the MTF to fund other programs, because if the public is dissatisfied, these elected officials are in danger of losing their jobs. We vacate the trial court's order and remand for dismissal of this cause of action.

Vacated and remanded for dismissal.