*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

TRINITY HENDERSON,

        Plaintiff-Appellee,

v

CITY OF MELVINDALE and MELVINDALE
CHIEF OF POLICE,

        Defendants,

MATHEW FURMAN,

        Defendant-Appellant.

UNPUBLISHED
November 21, 2019

No. 342679
Wayne Circuit Court
LC No. 16-014944-CZ

Before: RONAYNE KRAUSE, P.J., and METER and STEPHENS, JJ.

PER CURIAM.

In this interlocutory appeal pursuant to MCR 7.202(6)(a)(*v*), defendant Officer Mathew Furman appeals by right the trial court's order denying his motion for summary disposition under MCR 2.116(C)(7). Plaintiff, Trinity Henderson, was driving with an expired license plate when Officer Furman made a traffic stop of her vehicle and subsequently arrested her, with some difficulty. The incident was recorded by Officer Furman's patrol car camera and body microphone. The parties dispute whether Officer Furman used unreasonable and excessive force in effectuating that arrest. The other defendants were dismissed with prejudice by stipulation. After carefully reviewing the audiovisual recording of the arrest and its attendant circumstances, we conclude that reasonable minds could not conclude that Officer Furman's conduct was grossly negligent or constituted an intentional tort. We therefore reverse the trial court's denial of summary disposition in favor of Officer Furman, and we remand for entry of an order of judgment in his favor.

## I. BACKGROUND

Officer Furman is a police officer employed by the Melvindale Police Department, and the parties agreed from the outset that at all relevant times, he acted under color of law and

-1-

within the scope and course of his employment. Officer Furman effectuated a traffic stop of plaintiff's vehicle at approximately 9:30 a.m. on February 10, 2015. Officer Furman rapidly discovered that the vehicle's license plate was expired, the vehicle's license plate was not registered to plaintiff's vehicle, plaintiff's driver's license was suspended, plaintiff had no insurance, and the vehicle had not been registered even though plaintiff had purchased it two years previously. There is no dispute that the morning was cold, and plaintiff was driving with her young child in the back seat. Plaintiff contended that she had not been speeding when Officer Furman effectuated the traffic stop, and nothing in the record suggests that she had been speeding. There is also no dispute that the stop was legally valid.[1]

Most of the evidence in this matter consists of the combined video recording from Officer Furman's patrol car camera and audio recording from Officer Furman's body microphone. The gravamen of the dispute is how to characterize the events recorded. Unfortunately, some of the audio is indiscernible due to background noise, distance from the microphone, or individuals talking over each other; and some of the events occurred partially or completely outside the camera's range. Nevertheless, after carefully reviewing the video, it is clear that much of plaintiff's characterization is untenable and in irreconcilable conflict with her deposition testimony.

The traffic stop commenced with Officer Furman making a U-turn to follow plaintiff's vehicle. Shortly thereafter, Officer Furman activated his patrol vehicle's lights and effectuated a stop of plaintiff's vehicle. Officer Furman conducted a search using Michigan's Law Enforcement Information Network (LEIN), and he discovered that plaintiff's license plate was expired and she had no insurance on file. Officer Furman approached plaintiff's window and asked plaintiff who owned the car. Plaintiff responded that the vehicle belonged to her grandfather. Plaintiff later told Officer Furman that she bought the vehicle but had registered it under her grandfather's name. Plaintiff admits that both statements were lies: she had never registered the vehicle. As noted, there is no dispute that plaintiff actually owned the vehicle. However, she admitted to Officer Furman that she did not know from where the license plate had come.

After Officer Furman made several requests for plaintiff's driver's license, plaintiff eventually provided some kind of identification. Officer Furman discovered that plaintiff's driver's license had been suspended since 2012. Officer Furman then explained to plaintiff that she had been legally obligated to fill out certain paperwork at the time she purchased the car, and he refused to accept plaintiff's assertion that she lacked the time to do so, especially after learning that plaintiff had owned the vehicle for two years. Officer Furman returned to his patrol car with plaintiff's ignition key in his possession.

Officer Furman then walked back to plaintiff and her vehicle, and he advised plaintiff that "you need to call for a ride for your kid, because you're going to be going to jail, and the car's going to be getting impounded." Plaintiff demanded to know why she was going to jail, whereupon Officer Furman explained that "driving with license suspended, driving an

---

[1] See footnote 5 below.

unregistered motor vehicle, improper license plate, no insurance" were "all misdemeanor charges." Plaintiff asked if she would be going to jail, which Officer Furman confirmed; he then repeated that plaintiff needed to "call for a ride for your kid, otherwise I'll contact Child Protective Services." Plaintiff then loudly asserted that Officer Furman would not be making such a call, and Officer Furman again explained that he would only do so if plaintiff could not arrange for a ride. Plaintiff again demanded to know why she was going to jail. Officer Furman attempted to repeat his enumeration of plaintiff's misdemeanors, over her interruptions and assertion that her license was not suspended.

At that point, plaintiff began shouting profanity and threats[2] at Officer Furman, including a statement that "I promise you that you're going to have some repercussions because I'm going to sue the fuck out of you now," and a statement that she would "whoop his ass." Plaintiff explained later that the reference to "whooping his ass" had been a remark made on the phone to her mother because she found Officer Furman frustrating. Nonetheless, Officer Furman made six demands to plaintiff to step out of the vehicle, including a statement that he would pull her out if she did not comply. Plaintiff explicitly refused and stated that she was "not going to step out." Plaintiff made some kind of hasty gesture toward the back seat, which she later explained was an effort to throw a blanket over her child to protect the child against the cold. However, the police report indicated that Officer Furman did not have a clear view of plaintiff's hands, and, consistent with plaintiff's deposition testimony regarding her search for her ID, there were several purses and bags within plaintiff's reach. As noted, Officer Furman advised plaintiff that if she did not step out of her vehicle, he would remove her. Plaintiff did not comply. Officer Furman then reached into the car and, with obvious difficulty, pulled plaintiff from the vehicle.

Unfortunately, what immediately transpired next was partially out of range of the patrol car's camera. However, plaintiff clearly struggled with Officer Furman and ran over to the bumper guard of the police vehicle. Plaintiff latched onto the police vehicle with her legs and with one hand, while operating her cellphone with her other hand. A struggle ensued during which Officer Furman repeatedly ordered plaintiff to let go of the police vehicle and attempted to pull her off of the vehicle. In response, plaintiff did not let go and told Officer Furman to "stop dealing with me like that" and "you fucking racist as fuck and I'm going to sue the fuck out of this department." At some point during the struggle, Officer Furman grabbed plaintiff's hair, and plaintiff's head was forced onto the hood of the car several times.

Plaintiff contends that Officer Furman beat her head against the hood. It is readily apparent from the video that Officer Furman pulled plaintiff's hair and that her head contacted the hood several times. It is equally apparent that Officer Furman was endeavoring to remove plaintiff from the bumper of the police vehicle, and he repeatedly ordered her to "let go" throughout. Plaintiff was unambiguously struggling against the officer, and so it is not clear why plaintiff's head contacted the hood. It is apparent that Officer Furman was attempting to put plaintiff's arms behind her back to effectuate her arrest, while plaintiff was attempting to prevent

---

[2] The trial court seemed inexplicably concerned mostly by plaintiff's verbal disrespect.

-3-

him from doing so. Plaintiff also kept hold of her cellphone and continued yelling into it. Plaintiff did eventually let go of the vehicle and dropped to the ground.

Most of plaintiff's body was out of view of the camera while she was on the ground in front of the police vehicle. Nevertheless, there are several points of unambiguous conflict between the objective evidence on the video and plaintiff's testimony.

Most saliently, it is clear that plaintiff was continuing to resist and struggle, contrary to her contention that "he was attacking me for some odd reason," with the implication that she was being compliant. In fact, by the time Officer Furman succeeded in handcuffing plaintiff, she had blatantly disobeyed at least twenty verbal instructions that we can clearly discern from the video. Plaintiff told Officer Furman that she was "not going to go to prison." Officer Furman informed plaintiff that he "will taser [her]." Plaintiff contended in her complaint that she was tased "at least ten (10) times," although on appeal she appears to tacitly concede that she was in fact stunned[3] only three times. Officer Furman testified that he activated his taser in "drive sting" mode four times, one of which was only to make noise and did not contact plaintiff. From the video, it is objectively clear that Officer Furman had his taser unholstered for 43 seconds, a distinct crackling sound can be heard four times, and the taser is obviously not in contact with plaintiff during one of those times. Some of plaintiff's limbs were visible above the hood of the police vehicle at least four times, which clearly indicates that plaintiff was continuing to struggle and was not immobilized. Officer Furman ordered plaintiff to put her hands behind her back several times. After the fourth occurrence of crackling, plaintiff apparently complied, whereupon Officer Furman instructed her to keep her hands behind her back, holstered his taser, and placed plaintiff in handcuffs.[4] Officer Furman then reported to his radio that plaintiff was in custody.

Another officer arrived to assist, and both officers attempted to help plaintiff to her feet several times, in response to which plaintiff contended that she could not move her legs, that she had an epidural to give birth to her child "about a month and a half ago," and her legs were in some way impaired due to a prior accident. Officer Furman then summoned an ambulance. Supposedly, a computer log in Officer Furman's taser confirmed that it was activated only four times. No such log was entered into evidence, but as described above, three stun contacts and one "dry" activation is consistent with the video and with both parties' deposition testimonies.

---

[3] It was explained that tasers can operate in two modes: "tasing" will immobilize a person, whereas "stunning" or "drive stinging" requires direct physical contact and is "for pain compliance." Officer Furman stated that he only used his taser in "drive sting" mode. Aside from confusion over nomenclature, plaintiff offers nothing to contradict that statement, and the video recording casts no doubt on that statement. We have not found anything in the record suggesting what the term "full blast" might mean.

[4] Notably, it is clear that Officer Furman holstered his taser before removing the handcuffs from his belt, so even with plaintiff mostly out of sight, the video objectively establishes that Officer Furman could not possibly have deployed his taser *after* handcuffing plaintiff.

While awaiting the ambulance, plaintiff's grandfather arrived. Plaintiff contends that the officers "yelled at" her grandfather and told him to leave the scene until her grandfather explained that he was there to pick up plaintiff's child. The video shows almost the exact opposite. Plaintiff's grandfather's arrival was heralded by the grandfather repeatedly shouting "this is crazy" at the officers. He continued to shout while the officers attempted to provide an answer to his demand to know "why do you have my grandbaby on the ground like that?" The grandfather visibly calmed down when the officers responded affirmatively to his request to retrieve plaintiff's child. However, after the grandfather removed the child from plaintiff's vehicle and complying with the officers' request to see his identification, he resumed shouting at the officers. The grandfather left the scene when the officers explained to him that he needed to leave because he had the baby and was refusing to listen to their responses to his questions.

The video concluded with ambulance personnel helping plaintiff into the ambulance, and the remaining officers conducting an inventory search of plaintiff's vehicle. The video shows that plaintiff's mobility was significantly improved from when the officers had attempted to help her to her feet approximately nine minutes earlier, and she was able to walk with assistance out of sight of the camera. Plaintiff was then taken to a hospital, where she received a lumbar spine x-ray and was diagnosed with "bilateral leg pain," but she was discharged without being prescribed any medication and advised to follow up with a physician. She was then booked and released at the Melvindale police station. Plaintiff returned to a different hospital the next day because she could not move her neck or shoulder, and she had a migraine. She was diagnosed with "neck strain" and "head injury." She later followed up with another physician, and according to her complaint, plaintiff continues to receive medical treatment for injuries she suffered. In an unclear statement, plaintiff expressed the apparent belief that she had been "profiled." Plaintiff explained that two days after the incident, she was pulled over again by a different police officer while driving her husband's car, and that officer allowed her to leave even though she still did not have a valid driver's license.[5]

Plaintiff stipulated to dismiss with prejudice the City of Melvindale and the Melvindale Chief of Police. In response to Officer Furman's motion for summary disposition, the trial court observed that plaintiff's threat to Officer Furman "wasn't followed up with any physical actions on her part which would support those words beating up a police [sic]." With no other

---

[5] The record does not disclose why Officer Furman chose to follow plaintiff's vehicle, possibly because the parties, frustratingly, did not include the entirety of Officer Furman's deposition. We observe, however, that the circumstances of this alleged later stop are mostly unknown and thus difficult to compare. In contrast, it is clear from the video that plaintiff was committing the traffic violation of driving with her high-beam headlights activated within 500 feet of oncoming traffic, amply justifying Officer Furman's decision to focus his attention on plaintiff's vehicle. MCL 257.700(b); *People v Laube*, 154 Mich App 400, 406-407; 397 NW2d 325 (1986). Everyday experience suggests a high degree of improbability that anyone could discern much detail about a driver with high-beams activated from the vantage point of oncoming traffic, even during the day. Nevertheless, as our dissenting colleague observes, plaintiff concedes that her arrest was lawful.

explication, the trial court concluded that there were questions of fact whether Officer Furman's conduct was grossly negligent, whether his actions were the proximate cause of plaintiff's injuries, whether he performed in good faith, or whether he performed within the scope of his authority. The trial court therefore denied the motion for summary disposition as to Officer Furman as the remaining defendant. This appeal followed.

## II. STANDARD OF REVIEW

A grant or denial of summary disposition is reviewed de novo on the basis of the entire record to determine if the moving party is entitled to judgment as a matter of law. *Maiden v Rozwood*, 461 Mich 109, 118; 597 NW2d 817 (1999). Under MCR 2.116(C)(7), where the claim is allegedly barred, the trial court must accept as true the contents of the complaint, unless they are contradicted by documentary evidence submitted by the moving party. *Id*. at 119. Only substantively admissible materials may be considered. *Willett v Charter Twp of Waterford*, 271 Mich App 38, 45; 718 NW2d 386 (2006). If the facts are undisputed or could not support a reasonable difference in interpretation, the court will determine as a question of law whether the claim is barred. *Id*. Summary disposition is rarely appropriate if witness credibility is at issue. *In re Handelsman*, 266 Mich App 433, 438-439; 702 NW2d 641 (2005). However, under exceptional circumstances where a witness's testimony is totally impossible, irreconcilably conflicts with objective physical realities, or is so implausible that it could not possibly be believed by a reasonable juror, it may be proper for a trial court to withdraw the assessment of a witness's credibility from the trier of fact. *People v Lemmon*, 456 Mich 625, 642-646; 576 NW2d 129 (1998). "The question whether an entity has immunity is one of law, which we review de novo." *Co Rd Ass'n of Mich v Governor*, 287 Mich App 95, 118; 782 NW2d 784 (2010).

## III. GOVERNMENTAL IMMUNITY

Governmental immunity as to governmental employees is an affirmative defense, and the burden of proof is on the employee. *Odom v Wayne Co*, 482 Mich 459, 479; 760 NW2d 217 (2008). Under the Governmental Immunity Act (the Act), MCL 691.1401 *et seq*., inferior governmental employees are immune from negligent tort liability if all of the following criteria are met:

(a) The officer, employee, member, or volunteer is acting or reasonably believes he or she is acting within the scope of his or her authority.

(b) The governmental agency is engaged in the exercise or discharge of a governmental function.

(c) The officer's, employee's, member's, or volunteer's conduct does not amount to gross negligence that is the proximate cause of the injury or damage. [MCL 691.1407(2).]

Nevertheless, MCL 691.1407(3) explicitly preserves "the law of intentional torts as it existed before July 7, 1986." Thus, immunity by inferior governmental employees to intentional torts is governed by common law. *Odom*, 482 Mich at 469-472. Inferior governmental employees are immune from intentional tort liability

if (1) the employee's challenged acts were undertaken during the course of employment and the employee was acting, or reasonably believed he or she was acting, within the scope of his or her authority, (2) the acts were undertaken in good faith, or were not undertaken with malice, and (3) the acts were discretionary, rather than ministerial, in nature. [*Oliver v Smith*, 290 Mich App 678, 688; 810 NW2d 57 (2010).]

The parties agree that Officer Furman's challenged acts occurred within the course of his employment and in the exercise or discharge of a governmental function, and plaintiff at least tacitly concedes that Officer Furman acted within the scope of his authority.

## IV. GROSS NEGLIGENCE

As noted, the parties explicitly or implicitly agree that MCL 691.1407(2)(a) and (b) are established. Consequently, Officer Furman's potential liability for gross negligence depends on whether his conduct in effectuating the arrest of plaintiff "amount[ed] to gross negligence that [was] the proximate cause of [plaintiff's] injur[ies]." " 'Gross negligence' means conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results." MCL 691.1407(8)(a).

## A. PROXIMATE CAUSE

In inverse order, we first reject Officer Furman's contention that his conduct could not have been the proximate cause of plaintiff's injuries. Under MCL 691.1407(2)(c), "the proximate cause" means "[t]he one most immediate, efficient, and direct cause of [the plaintiff's] injuries." *Robinson v City of Detroit*, 462 Mich 439, 462; 613 NW2d 307 (2000). Officer Furman correctly observes that the word "the" requires a governmental actor's conduct to be the single proximate cause of any injury, not merely a proximate cause. *Id*. However, it is disingenuous to argue that plaintiff is the cause of her own injuries merely because she could have chosen to disengage and comply at any time.

Proximate cause turns on whether there is an inescapable chain of causality linking the act to the outcome; an intervening event will not break that chain if the intervening event is itself a consequence of the act. See *McMillian v Vliet*, 422 Mich 570, 576; 374 NW2d 679 (1985). Proximate causation "involves the foreseeability of the consequences of the conduct of human actors," whether the inquiry is into "a" cause or "the" cause. *Ray v Swager*, 501 Mich 52, 67; 903 NW2d 366 (2017). It is predictable and natural for any person to react adversely to obviously egregious misconduct suggesting imminent harm by an arresting officer. See *People v Clements*, 68 Mich 655, 658; 36 NW 792 (1888); *People v Krum*, 374 Mich 356, 361-362; 132 NW2d 69 (1965); *People v Moreno*, 491 Mich 38, 46-47; 814 NW2d 624 (2012) (discussing the right to resist unlawful police conduct). An arresting officer should not be totally immunized from actual misconduct merely because the arrestee was not completely compliant. In any event, the analysis of proximate cause linking the officer's conduct to a plaintiff's injury is independent of whether the officer's conduct was, or was not, wrongful. Thus, there is at least a question of fact regarding proximate cause. Cf. *Oliver*, 290 Mich App at 687.

## B. QUESTION OF FACT

In contrast, the trial court erred in finding a genuine question of fact regarding gross negligence. As noted, " '[g]ross negligence' means conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results." MCL 691.1407(8)(a). This definition "has been characterized as a willful disregard of safety measures and a singular disregard for substantial risks." *Oliver*, 290 Mich App at 685. Gross negligence is a deferential standard that may not be established based on the benefit of hindsight or the fact that an officer could have exercised greater care. *Tarlea v Crabtree*, 263 Mich App 80, 90; 687 NW2d 333 (2004). "[E]vidence of ordinary negligence does not create a material question of fact concerning gross negligence." *Maiden*, 461 Mich at 122-123.

In the particular context of a police officer effectuating an arrest, our Supreme Court has explained:

> Police officers, especially when faced with a potentially dangerous situation, must be given a wide degree of discretion in determining what type of action will best ensure the safety of the individuals involved and the general public, the cessation of unlawful conduct, and the apprehension of wrongdoers. The determination of what type of action to take, *e.g.*, make an immediate arrest, pursue a suspect, issue a warning, await backup assistance, etc., is a discretionary-decisional act entitled to immunity. Once that decision has been made, however, the execution thereof must be performed in a proper manner, *e.g.*, the arrest must be made without excessive force, the pursuit of the suspect must not be done negligently, the request for assistance must include reasonably accurate information, etc. [*Ross v Consumers Power Co (On Rehearing)*, 420 Mich 567, 659-660; 363 NW2d 641 (1984), superseded in part by MCL 691.1407 on other grounds as stated in *In re Bradley Estate*, 494 Mich 367, 384-389; 835 NW2d 545 (2013)].

An act that would be ministerial under some circumstances might be elevated to a discretionary act under other circumstances. *Oliver*, 290 Mich App at 690. "[T]he amount of force necessary to effectuate an arrest" is a discretionary act. *Odom v Wayne Co*, 482 Mich 459, 476; 760 NW2d 217 (2008). What constitutes "excessive force" is highly contextual and dependent on what an ordinary and prudent person would, from the perspective of the arresting officer, deem reasonable. See *Brewer v Perrin*, 132 Mich App 520, 528-529; 349 NW2d 198 (1984), abrogated on other grounds by *Odom*, 482 Mich at 473 n 33.

Notwithstanding plaintiff's efforts to excuse her conduct, the fact is that she repeatedly and belligerently disobeyed lawful commands from a police officer she knew to be acting within the scope of his authority. As noted, plaintiff knowingly violated at least twenty clear and direct orders before she was handcuffed. Furthermore, she did not do so in a peaceable or passive manner. Aggressiveness, belligerence, threatening conduct, and physical resistance by an arrestee are all circumstances that afford an arresting officer significantly greater discretion in how to respond. *Oliver*, 290 Mich App at 690. Plaintiff admits that Officer Furman's discovery that she was committing several crimes justified her arrest and the use of reasonable force incident to that arrest. *Brewer*, 132 Mich App at 527-529. The police report indicates that Officer Furman was concerned for his own safety, which, whatever plaintiff's motives, would have been a reasonable concern for any officer under the circumstances. In particular, the police report indicated that there were several bags within plaintiff's reach, and plaintiff, by her own

admission, made a hasty gesture toward the back seat of her vehicle. Any reasonable police officer would consider both aspects of the situation serious dangers, especially after plaintiff repeatedly and openly defied numerous lawful commands *and* threatened Officer Furman with violence. The fact that plaintiff was unarmed could only have been known to Officer Furman in hindsight.

Furthermore, nothing in the video supports plaintiff's contention that she was "thrown" by Officer Furman onto the hood of his police vehicle. Although some of the struggle occurs out of view, it is clear that plaintiff is instead attempting to escape from Officer Furman's grip. By her own admission, she then latched onto the bumper of the police vehicle and continued to physically struggle and refuse orders to comply. Although plaintiff is mostly out of view of the camera when Officer Furman stunned her with his taser, no reasonable person could conclude that plaintiff was being compliant and Officer Furman was attacking her. It is unambiguous that, for example, Officer Furman did not strike plaintiff, use a baton, pull his gun, address plaintiff by any slurs or similar disrespectful language,[6] or engage in any unannounced sudden acts that might make a reasonable person panic.

The video does, consistent with plaintiff's description of events, show Officer Furman grabbing her hair and banging her head on the hood of the vehicle. Officer Furman's conduct of banging plaintiff's head arguably creates at least a jury question regarding *ordinary* negligence. However, that does not by itself create a jury question regarding *gross* negligence. *Maiden*, 461 Mich at 122-123. Under the circumstances, Officer Furman was attempting to bring under control an individual who had been unambiguously threatening, repeatedly noncompliant, and at least somewhat violent. Twice during the video, plaintiff tells Officer Furman, "You act like I got a weapon or something." However, as Officer Furman explained to the grandfather later in the video, he did not know whether plaintiff was in fact armed. Indeed, there is no way Officer Furman could have immediately known whether, or how, plaintiff was armed or had ready access to any weapons, and given the numerous lies plaintiff had already made, Officer Furman had no reason to afford her any benefit of the doubt. If plaintiff had been armed, any of the numerous passers-by, including plaintiff's own child, could have been injured if Officer Furman had not brought the situation under control as quickly as possible.

Importantly, none of the discrete events that occurred can be considered in isolation. "Reasonable foreseeability is a necessary prerequisite to any finding of a duty under Michigan law." *Graves v Warner Bros*, 253 Mich App 486, 499-500; 656 NW2d 195 (2002). Officer Furman was faced with a rapidly-unfolding situation with objective and unambiguous reasons to believe that plaintiff was not merely noncompliant, but actually dangerous. Any particular instance of Officer Furman's conduct must be considered in the context of the events preceding that instance, including plaintiff's own conduct. With the benefit of hindsight and in the comfort of an office or courtroom, it may be possible to say that Officer Furman had other options available to him. However, hindsight does not establish a question of fact regarding ordinary

---

[6] Officer Furman used profanity once during the entire video, telling plaintiff to "let fucking go" of the police vehicle.

negligence, let alone gross negligence.  *Tarlea*, 263 Mich App at 90; see also *Norris v Lincoln Park Police Officers*, 292 Mich App 574, 580; 808 NW2d 578 (2011).   Similarly, with the availability of video playback software that can be conveniently cued to any arbitrary point in time, it is easy to look at an isolated act with horror.  However, "what may be extreme and outrageous under one set of circumstances may be justifiable under different circumstances." *Rosenberg v Rosenberg Bros Special Account*, 134 Mich App 342, 351; 351 NW2d 563 (1984) (discussing intentional infliction of emotional distress).  It is disingenuous and contrary to basic principles of jurisprudence to consider portions of the video out of context.

In short, the video blatantly contradicts plaintiff's contention that she could have been taken into custody without the use of force.  Rather, the video unambiguously establishes that it was necessary for Officer Furman to use some degree of force, or at least that any reasonable police officer would have believed some degree of force to be necessary.  This matter does not entail merely conflicting testimonies, but rather testimony that irreconcilably conflicts with *objective* evidence.  See *Lemmon*, 456 Mich at 642-646.  Plaintiff's belligerent, threatening, and resistive conduct afforded Officer Furman a great deal of discretion in determining how much force was necessary under the circumstances.  Based on those circumstances, no reasonable person could conclude that Officer Furman's conduct was sufficiently egregious to create a question of fact whether he willfully disregarded plaintiff's safety or the possibility of any ensuing injury.  The trial court erred in finding a *genuine* question of material fact.[7]

## V.  INTENTIONAL TORTS

As discussed, there is no serious dispute that Officer Furman's challenged acts occurred within the course of his employment and the scope of his authority.  As also discussed, there can be no doubt that plaintiff's own conduct elevated Officer Furman's acts from ministerial to discretionary in nature.  Thus, presuming plaintiff could otherwise prove the specific elements of assault and battery or intentional infliction of emotional distress, the threshold question is whether Officer Furman's acts "were undertaken in good faith, or were not undertaken with malice." *Oliver*, 290 Mich App 688.  Again, the trial court erred in finding a question of fact.

Plaintiff generally asserts that it was unnecessary for Officer Furman to use any force whatsoever.  This position is simply absurd.  Plaintiff's contention that Officer Furman was the individual making threats, rather than plaintiff, is flatly contradicted by the video.  Under the circumstances, there is no plausible doubt that the force Officer Furman used mostly did not exceed what a reasonably prudent person under the circumstances would believe warranted.  See

---

[7] We have some doubt whether plaintiff properly articulated a gross negligence claim at all, given that her complaint appears to allege entirely intentional misconduct by Officer Furman. Michigan does not recognize a cause of action for gross negligence based entirely on what is really an intentional tort.  See *VanVorous v Burmeister*, 262 Mich App 467, 483-484; 687 NW2d 132 (2004), overruled in part on other grounds by *Odom*, 482 Mich at 473 n 33; *Smith v Stolberg*, 231 Mich App 256, 258-259; 586 NW2d 103 (1998); *Latits v Phillips*, 298 Mich App 109, 120; 826 NW2d 190 (2012).  However, neither party argues this possibility, and in light of our resolution of this issue based on the video, we need not resolve it.

*Oliver*, 290 Mich App at 688-690. There may be some doubt about the need for Officer Furman to grab plaintiff's hair and bang her head on the hood. However, if it is unclear whether the force used by an officer was excessive, it generally cannot be considered malicious. *Latits v Phillips*, 298 Mich App 109, 116-118; 826 NW2d 190 (2012). The video unambiguously shows that Officer Furman was reacting to a belligerent, defiant, threatening, and at least marginally violent individual who had repeatedly refused calmly-stated lawful orders. Although plaintiff would *eventually* prove to be unarmed, as discussed, we find nothing to show that Officer Furman should have known that from the outset. Under the circumstances, *if* it was excessive for Officer Furman to grab plaintiff's hair and bang her head on the hood, it was not *so* excessive as to create a question of fact regarding malice or a lack of good faith.

In short, this is not a case in which a factual dispute is based on conflicting eyewitness testimonies. Rather, plaintiff's argument effectively depends on believing her stated narrative rather than what is objectively depicted on the video. Ordinarily, courts must reserve to the trier of fact the resolution of conflicting evidence. See *People v Howard*, 50 Mich 239, 242-243; 15 NW 101 (1883); *Nichol v Billot*, 406 Mich 284, 301-302; 279 NW2d 761 (1979). However, we find this case to present one of the rare occasions under which the testimony purportedly creating a conflict is physically or effectively impossible. See *Lemmon*, 456 Mich at 643-646. Critically, the evidence in this matter is primarily an objective audiovisual recording rather than differing narratives by the parties. In the absence of any assertion or indication that the video has been altered, any of plaintiff's testimony that directly conflicts with the video is not a valid basis for showing a genuine question of material fact. The video itself unambiguously precludes us from finding a question of fact whether Officer Furman acted in bad faith or with malice. In the absence of a *genuine* question of fact, summary disposition should have been granted in Officer Furman's favor.

The trial court's order denying Officer Furman's motion for summary disposition is reversed, and the matter is remanded for entry of judgment in favor of defendants. We do not retain jurisdiction. Officer Furman, being the prevailing party, may tax costs. MCR 7.219(A).

/s/ Amy Ronayne Krause
/s/ Patrick M. Meter

-11-